**OMRON HEALTHCARE, INC.,**
Plaintiff–Appellant,

v.

**MACLAREN EXPORTS LIMITED,**
Defendant–Appellee.

No. 93–2965.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1994.

Decided June 27, 1994.

---

Marcia E. Goodman, Marian C. Haney, Jeffrey S. Fowler (argued), Mayer, Brown & Platt, Chicago, IL, for plaintiff-appellant.

John L. Conlon (argued), Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

A few years ago the Marshall Baby Products Division of Omron Healthcare became the exclusive distributor, in the United States, of baby strollers manufactured by Restair Maclaren Limited, a British firm. The contract allowed Maclaren to cancel on 90 days' notice. Disappointed by Omron's sales, Maclaren gave notice terminating the distributorship as of January 22, 1993. One of Omron's employees left to create a new firm, KidCo, which became Maclaren's U.S. distributor. Omron noticed that KidCo's strollers identified Omron as the distributor, and it sued Maclaren for trademark infringement.

When Omron's distributorship ended, Maclaren had on hand 2,300 strollers that had been manufactured with trademarks identifying Omron as the seller. (Each stroller also, and more prominently, identified Maclaren as the manufacturer.) Maclaren blames Omron for this situation, contending that after receiving notice of termination Omron placed firm orders for the strollers, demanded that Maclaren build them, and then refused to accept delivery; Omron denies that it is responsible for the excess inventory. Maclaren and its new distributor pasted labels over the Omron marks and included literature identifying KidCo as the reseller but did not succeed in obliterating all traces of Omron's trademarks. Omron demands a remedy. Maclaren moved to dismiss, relying on this portion of its contract with Omron:

> The parties hereto agree that all disputes arising out of this Agreement which cannot

be resolved amicably between the parties shall be referred to the High Court of Justice in England which will have exclusive jurisdiction to determine such disputes.

Omron protested that this dispute arose out of trademark infringement, not out of the contract, and that Maclaren would have been equally (if not more) liable for its conduct had there never been an agreement. To this the district court replied:

> Because the instant dispute would not have arisen if Omron and Maclaren Exports had never entered into their Distribution Agreement, the case at bar "arises out of" the Distribution Agreement. The forum selection clause in the Distribution Agreement therefore deprives this court of jurisdiction over the matter. Accordingly, the case is dismissed with prejudice.

■ But-for causation is an unsatisfactory understanding of language referring to "disputes arising out of" an agreement. Let us suppose that while inspecting Omron's facilities, a manager of Maclaren stepped on a baby rattle and fell. Would the ensuing tort litigation go to the High Court of Justice in the United Kingdom just because, but for the distribution agreement, none of Maclaren's employees would have been on Omron's premises? "Arising out of" and "arising under" are familiar phrases, and courts have resisted the siren call of collapsing them to but-for causation. An example: but for the existence of federal drug safety standards, it would not be possible to contend that noncompliance with the standards is tortious, but it does not follow that a tort suit "arises under" those standards and thus activates federal jurisdiction. *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). See also, e.g., *Spearman v. Exxon Coal USA, Inc.*, 16 F.3d 722 (7th Cir.1994).

Nonetheless, the parties' dispute arises out of the agreement. Maclaren contends that its conduct in selling the 2,300 strollers bearing Omron's marks is justified by orders Omron placed under the agreement, coupled with its refusal to accept delivery. Although the distribution agreement does not provide expressly for the means of wrapping up the parties' affairs and disposing of unsold inventory, courts regularly imply such terms—not as legal rules independent of the contract, but as implicit terms *under* the contract. When the contracting parties have not provided explicitly for some contingency, courts impute to their contract the provisions that they probably would have adopted had they focused on the subject and resolved it explicitly. These imputed terms are justified not only by a desire to make contract a more productive institution by holding down the costs of bargaining, but also by the parties' knowledge of the common law history of judicial gap-filling. Because these parties did not provide expressly for the disposition of unsold inventory, they invited a process of construction that will resolve their dispute. A court might say that the agreement implicitly licensed Maclaren to use the marks incident to a commercially reasonable means of selling the inventory. There are other possible outcomes, but all depend on an understanding of the parties' written bargain and of its implied terms.

■ Omron's claim engages both the parties' compact and the rules of trademark law, but the fact that the parties' designated forum would have to interpret federal law is no obstacle to the reference. E.g., *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (arbitration of claims under the Age Discrimination in Employment Act); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (forum selection clause sending admiralty case to Florida); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 U.S. 1917, 104 L.Ed.2d 526 (1989) (arbitration of claims under the Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (arbitration of claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (arbitration in Japan of claims under U.S. antitrust laws); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (arbitra-

tion in France of claims under the Securities Exchange Act of 1934); *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clause sending admiralty case to High Court of Justice in England); *Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993) (forum selection clause sending fraud and securities claims to England).

■ We concluded in *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress International, Ltd.,* 1 F.3d 639, 642–43 (7th Cir. 1993), that all disputes the resolution of which arguably depend on the construction of an agreement "arise out of" that agreement for purposes of an arbitration clause. See also *Hugel v. Corporation of Lloyd's,* 999 F.2d 206 (7th Cir.1993); *S + L + H S.p.A. v. Miller–St. Nazianz, Inc.,* 988 F.2d 1518 (7th Cir.1993). We cannot imagine why the scope of that phrase would differ for purposes of a forum-selection clause. Neither side contends that the phrase has any special meaning in this contract, so *Sweet Dreams* is a sufficient answer to Omron's submission. Perhaps the second circuit has a more restricted view of such language, see *Corcovado Music Corp. v. Hollis Music, Inc.,* 981 F.2d 679, 682–83 (2d Cir.1993), but in *Sweet Dreams,* 1 F.3d at 642, we expressly disagreed with a precursor decision in that circuit, *In re Kinoshita & Co.,* 287 F.2d 951 (2d Cir.1961). When *Kinoshita* was decided, many judges were hostile to sending questions of U.S. law to arbitration abroad. Although the panel in *Corcovado* was not overtly hostile to permitting the parties to choose their tribunal, it treated the fact that the claim would turn on an interpretation of U.S. copyright law as a dispositive argument in favor of decision by a federal court. It did not discuss *Gilmer* or any of the other cases cited in the preceding paragraph, and we find it unpersuasive.

■ According to Omron, sending this dispute to England would offend the public policy of the United States. What policy, in particular? The dominant policy in contract cases is enforcing the parties' agreement, the better to promote commerce. *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1912–13; see also *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279,

1327–30 (7th Cir.1992). American firms can hardly expect to do international business if American courts permit them to welch on their commitments to their trading partners.

Omron tells us that the "policies" in question favor sending disputes to courts that have the expertise to resolve them, and ensuring that courts with the interest of Americans at heart interpret laws designed for the protection of American consumers. Notice that neither of these policies has a secure footing in any statute. Public-policy arguments depend on the fact that "no court will lend its aid to one who founds a cause of action upon an immoral or illegal act". *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). Contracts that violate the rights of third parties aren't enforced; neither are agreements designed to get 'round statutes that protect the contracting parties from their own improvidence. But litigating in England is neither immoral nor illegal, and no law or policy of the United States demands that every dispute be litigated in the tribunal with the most experience—if that were so, jurisdiction based on diversity of citizenship would be abolished (for state courts have more experience with their own law than federal courts do), federal defenses to claims filed in state court would all be removed to federal court, and the courts of the United States would disclaim any power to adjudicate disputes under foreign law. Yet all of these things are common, even in cases of exceptional complexity. In *Amoco Cadiz* we devoted great energy to interpreting the law of France and the United Kingdom, without suggesting that we were violating a "public policy" of confining disputes to the tribunals with the most expertise.

Omron's reminder that the trademark laws are designed for the benefit of consumers as well as producers suggests that third-party interests are at stake. But the antitrust and securities laws also are designed for the benefit of consumers; indeed, we suppose that all U.S. laws may be said to serve the interests of (some) U.S. nationals. Does it follow that disputes that turn on the resolution of U.S. law must be decided in U.S. courts? If so, then *Scherk, Mitsubishi,* and many other

cases are wrongly decided, for they depend on the belief that foreign tribunals will interpret U.S. law honestly, just as the federal courts of the United States routinely interpret the law of the states and other nations.

 What is more, Omron cannot really tell us that third-party interests are so dominant that they must be protected from parties' voluntary bargains. Omron could have licensed Maclaren to use its trademarks for the 2,300 strollers. Omron fears that the High Court of Justice is more likely to rule in favor of a U.K. national than a court of this nation would be. We doubt that the commercial judges of the High Court, for whom international transactions are routine business, display such a bias—but, if they do, so what? Omron knew this when it signed the contract, and it would have received some compensation for the risk (a lower price of strollers, some procedural concession). If Omron is free to allow Maclaren to win with certainty by licensing its marks, a slight increase in the probability of Maclaren's prevailing cannot be objectionable. This case is about how much money changes hands between these parties, and not about the protection of American consumers. Compare the Sherman Act, which bars firms from agreeing to fix prices no matter how much all of them want to do so, and the securities acts, which forbid contractual waiver of their provisions. 15 U.S.C. §§ 1, 77n, 78cc(a). Here are *real* restrictions on the power of contract—yet the Supreme Court has held that antitrust and securities cases may be arbitrated in foreign nations.

Omron signed a contract promising to litigate in the High Court of Justice, or not at all. It broke that promise. Instead of seeking damages for breach of contract, Maclaren is content with specific performance. The district court properly dismissed the suit.

AFFIRMED.