**GRAHAM TECHNOLOGY SOLUTIONS, INC., a California corporation, Plaintiff,**

v.

**THINKING PICTURES, INC., a New York corporation, Defendant.**

**No. C–96–20790–EAI.**

United States District Court, N.D. California, San Jose Division.

Jan. 7, 1997.

Nathan Lane III, Mark C. Dosker, Graham & James, L.L.P., San Francisco, CA, for Defendant Thinking Pictures, Inc.

Kenneth B. Wilson, David H. Kramer, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Plaintiff Graham Technology Solutions.

ORDER TRANSFERRING ACTION TO SOUTHERN DISTRICT OF NEW YORK ON GROUNDS OF IMPROPER VENUE (RULE 12(b)(3), FED.R.CIV. P.)

INFANTE, United States Magistrate Judge.

## I. INTRODUCTION & PROCEDURAL BACKGROUND

Plaintiff Graham Technology Solutions, Inc. ("GTSI"), filed suit against defendant Thinking Pictures, Inc. ("TPI") alleging copyright infringement, unfair competition and false advertising. After filing suit, GTSI filed an expedited motion seeking relief from the automatic stay of formal discovery required by Civil L.R. 16–3 on the grounds that such discovery was required to determine the extent of TPI's alleged unlawful conduct prior to GTSI's filing of a motion for preliminary injunction. TPI opposed the motion, and filed a motion to dismiss, asserting that the appropriate venue for this action is the Southern District of New York. TPI argued that a choice of law provision contained within a Professional Services Agreement executed by John Graham, President of GTSI, barred venue in this district. Finding that the issue of venue must be resolved prior to any other procedural or substantive issues in this case, the court deferred GTSI's motion for expedited discovery and for entry of a protective order and set a briefing schedule for the motion to dismiss. The parties are presently before the court on defendant TPI's Motion to Dismiss or Transfer for Improper Venue.

## II. FACTUAL BACKGROUND

A. *TPI: The Development of rock.com and the Professional Services Agreement*

TPI is a privately owned corporation engaged in the development of technology which broadcasts sound and video images through interactive media, including the Internet. *See* Declaration of Stephan Fitch ("Fitch Decl."), ¶ 4. In 1994, TPI began developing a new product called rock.com. *Id.,* ¶ 4. Rock.com permits live audio and video transmission of rock and roll concerts through the Internet. By utilizing a process known as video streaming and audio streaming, digital video images and sounds are "conveyed to a web page that can be accessed without additional software." *Id.* The concept for rock.com is described by Stephan Fitch, Chief Technology Officer and founder of TPI, as follows:

As TPI envisioned the first phases of rock. com, three remote cameras would be locat-

ed at a rock club or other concert site. These cameras would be controlled by a camera operator from any place in the world via a web page on a personal computer. The camera operator would receive, via video streaming, images and sound from the cameras and could focus and control the cameras in accordance with instructions from a remote director. Obviously, it was necessary to see the images from the cameras in order to control them. Therefore, video streaming was an integral and necessary part of the remote camera control programming. In addition to the camera operator, a director would receive the images from the cameras via a separate web page. The director, too would need to receive real time images in order to give instructions to the camera operator and to select the desired image for the ultimate viewer. Once the director selected the appropriate camera shots ... the resulting image would be streamed, through a web browser, to the web page of the viewer sitting at a personal computer anywhere in the world. Both audio and video streaming were integral parts of rock.com from the outset. Neither the camera operator interface (web page) nor the remote camera control could be developed without using video and audio streaming.

Fitch Decl., ¶ 6.

In order to successfully complete the rock.com project, TPI required the assistance of a programmer. *Id.*, ¶ 6–7. In 1995, TPI contacted John Graham to provide the programming assistance required for the rock.com project. On or about May 4, 1995, Mr. Graham signed a non-disclosure agreement and began to review conceptual materials and schematics for rock.com. Fitch Decl., ¶ 8. In July 1995, Mr. Graham entered into a Professional Services Agreement ("PSA") on behalf of "John Graham and Graham Technology Solutions, a corporation organized under the laws of the State of California."[1] Fitch Decl., Ex. A, p. 1. The PSA "related to services to be provided to TPI[ ] in connection with the development of the prototype of, or other preliminary services in connection with an interactive multimedia product tentatively entitled 'rock.com.' " *Id.*

The terms of the PSA provided that TPI would own all right, title and interest to the completed work product described in Schedules A and B of the PSA as well as to all additions to, deletions from, alterations of or revisions in said work product.[2] *Id.*, p. 5, ¶ 4.1. TPI would also own all right, title and interest to all other materials provided to Mr. Graham by or at the expense of TPI, and all other materials developed or furnished by Mr. Graham in connection with the services he provided under the PSA. *Id.* The PSA further provided that: (1) TPI would have exclusive rights to Mr. Graham's completed work product; (2) Mr. Graham's work and services would be "work made for hire" for TPI; and (3) in the event that any work product of Mr. Graham's was determined not to be a work for hire, said work would be irrevocably assigned, transferred, released and conveyed to TPI. *Id.*, p. 5, ¶¶ 4.2–4.4. In addition the PSA contained a forum selection clause which stated:

> 10.11 The validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto shall be governed by and construed in accordance with the substantive laws of the state of New York, without reference to laws relating to conflicts of laws. The parties agree to *submit to the exclusive jurisdiction over all disputes hereunder* to the federal and state courts in the State of New York located in New York County.

*See* Fitch Decl., Ex. A, p. 10, ¶ 10.11 (emphasis added).

Mr. Graham began providing programming services to TPI under the terms of the

---

1. Although John Graham signed the PSA on behalf of a corporate entity, Graham Technology Solutions, it is undisputed that GTSI was not incorporated until May 1996, 10 months later.

2. Although the PSA references Schedule A (General Information and Description of Deliverables) and Schedule B (Delivery Schedule), neither schedule contains any information with respect to a description of the completed work product or a delivery schedule. Schedule A merely states "To be determined." Schedule B is blank.

PSA. In doing so, he reviewed proposed hardware and software specifications for rock.com. Fitch Decl., ¶ 10. Mr. Graham also attended at least two meetings with representatives of Sun Microsystems and Sony Worldwide Network ("Sony") to discuss and promote the rock.com project. *Id.*, ¶ 11. During the meetings, Mr. Graham was represented as part of the "TPI rock.com team" responsible for programming work. *Id.* It is not clear from the information provided by the parties when Mr. Graham's employment relationship with TPI ended. However, Mr. Graham's work on the rock.com project continued through at least August 15, 1995, as evidenced by an e-mail sent from Mr. Graham to Mr. Fitch which comments on the rock.com specifications, and appears to represent a continuing relationship between Mr. Graham and TPI:

> Everything looks good, the only thing I added is the spec on the Hardware 128 Meg RAM.... Here's the Agenda we took to SUN. It should be easy to break this down into software and hardware products which SUN can provide. Also look at the Engineering tasks and determine a cost estimate. I will give this list to Surya Johsua and Katherine Webster. I know that you know SUN's hot buttons so lets push them all.

*See* Fitch Decl., Ex. B, p. 1. Mr. Graham also had continuing access to TPI's hardware, and logged onto that hardware several times after the time that Mr. Graham alleges that his employment relationship with TPI had ended. Fitch Decl., ¶ 14.

B. *GTSI: John Graham and the Development of Real Time Audio and Video for Multiple Users*

1. *Allegations of the Complaint*

GTSI alleges that in 1994 Mr. Graham began development of a computer program that allowed the display of still live pictures over the Internet. Complaint, ¶ 8. Mr. Graham worked to enhance the computer program throughout 1994 and 1995. While doing so, he allegedly created three versions of his computer program that were similar to

and derived from his original work. *Id.* ¶ 9. The third version of the program, Real Time Audio and Video for Multiple Users, allowed "multiple Internet users to obtain live audio and video signals over the Internet through their Internet browser without the need for additional, specialized software applications." Complaint at 2:16–18. Mr. Graham assigned his rights to the three computer programs to GTSI and GTSI filed for copyrights registrations on the programs. *Id.* ¶ 9. The complaint further alleges that TPI illegally made and distributed copies of Real Time Audio and Video for Multiple Users, and falsely represented that TPI developed and is the owner of the program.

The allegations of the complaint are supported by the Declaration of John Graham filed in support of GTSI's motion for expedited discovery.[3] In his declaration, Mr. Graham described the development of the computer programs at issue as follows. By November 1995 Mr. Graham had created the first revised version of his computer program which allowed a single Internet user to obtain a "stream" of live video action as opposed to mere still pictures (the "Real Time Video"). Graham Decl., ¶ 9. A second revised version which allowed multiple Internet users to obtain live video streams (the "Real Time Video for Multiple Users") was available in December 1995. Graham Decl. ¶ 10. Mr. Graham's revisions to his computer program ultimately led to the third revised version in May 1996 (the "Real Time Audio and Video for Multiple Users"). *Id.*, ¶ 11. Each of these versions of the program was "related to and drew upon" Mr. Graham's original work. *Id.*, ¶ 12. Mr. Graham further asserts that he was assisted in the development of the Real Time Video program by his friend Ben Dubin (see Graham Decl, ¶ 8), and that Michael Fuller acted as a consultant on the development of the Real Time Audio and Video for Multiple Users program (see Graham Decl., ¶ 13).

Mr. Graham contradicts both the complaint and his prior declaration as to the development and creation of the computer

---

3. *See* Declaration of John Graham in Support of GTSI's Expedited Motion to Exclude Case and For Expedited Discovery (hereinafter "Graham Decl."), at ¶¶ 9–11.

programs in his Supplemental Declaration.[4] Although identified in both the complaint and his prior declaration as his own original works, Mr. Graham's supplemental declaration states that the computer program primarily at issue in this case, namely the Real Time Audio and Video for Multiple Users, was written in California by John Fuller, a California resident. Supp. Graham Decl. ¶ 4.[5]

### 2. *Graham's Employment Relationship with TPI and the Execution of the PSA*

Not surprisingly, Mr. Graham's description of his employment relationship with TPI and his work on the rock.com project differs considerably from that of TPI. Mr. Graham claims that he was approached by TPI in early 1995 to assist the company in connection with a demonstration of rock.com to Sony on August 3, 1995 (the "Sony Meeting"). Graham Decl., ¶ 15. Mr. Graham contends that he was hired specifically to "assist in preparing a computer program that would allow for the remote control of cameras through signals sent over the Internet." *Id.* Graham further claims that the PSA related solely to the work TPI asked him to perform in connection with the Sony Meeting (*Id.,* ¶ 20), and that he fulfilled his requirements under the PSA by providing TPI with "a video program in the public domain called IVS" which allowed "a cameraman or director to see the video being shot by a rock. com camera and reposition the camera accordingly." (Supp. Graham Decl., ¶ 9.) The IVS program differed from the multi-user video streaming program allegedly created by Mr. Fuller in that "IVS did not allow for in-browser viewing of the video stream, but instead required the camera man or director to use an additional application to see the video." *Id.*

Mr. Graham also claims that he entered into the PSA on July 31, 1995, while working as Graham Technology Solutions ("GTS") sole proprietorship, and that GTSI, which was not incorporated until May 1996, was not a party to the PSA. Supp. Graham Decl. ¶¶ 2 & 6.

### III. DISCUSSION

#### A. *Standards for Enforcement of Forum Selection Clauses*

 A motion to dismiss based on the enforcement of a forum selection clause is governed by Rule 12(b)(3), F.R.Civ.P. *See Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320, 324 (9th Cir.1996). Unlike a Rule 12(b)(6) motion, a motion under Rule 12(b)(3) does not require that the pleadings be accepted as true. *Id.* The court is permitted to consider facts outside of the pleading. *Id.* Interpretation and enforcement of contractual forum selection clauses are procedural issues to be decided under federal law. *Manetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 513 (9th Cir.1988). Under federal law, a forum selection clause is presumptively valid and should not be set aside unless the party challenging the clause shows that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud or overreaching. *See The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 14, 92 S.Ct. 1907 (1972); *Argueta,* 87 F.3d at 325.

#### B. *Scope of the Forum Selection Clause*

The threshold issue in this case is the applicability of the forum selection clause contained within the PSA. GTSI raises several arguments against enforcement of the forum selection clause. First, GTSI claims that it has not raised contractual issues related to the PSA, in its complaint, and that what is truly at stake in this case is the vindication of its rights under the Copyright Act, not the interpretation of a contract.[6]

---

**4.** Upon filing its opposition to TPI's motion to dismiss for lack of venue, GTSI filed the Supplemental Declaration of John Graham (hereinafter "Supp. Graham Decl.").

**5.** It is further asserted that Mr. Fuller was paid an hourly fee for his work on the audio and video streaming program, and that he was never an employee of Mr. Graham's or Graham Technology Solutions, Mr. Graham's sole proprietorship. *See* Fuller Decl., ¶ 2.

**6.** In filing its Opposition to the motion to dismiss, GTSI states that the copyrights asserted against TPI for the Real Time Video and Real Video for Multiple Users are not at issue in this case. GTSI, however, reserves the right to claim

Second, GTSI argues that neither it nor Mr. Fuller (the alleged creator of the Real Time Audio and Multiple Users Program) is a party to the PSA, and that neither GTSI nor Mr. Fuller ever had any agreement with TPI.[7]

#### 1. *Application of Forum Selection Clause to GTSI's Copyright Claims*

Initially the court must consider GTSI's contention that the scope of the forum selection clause does not cover the copyright claims asserted in GTSI's complaint. Although no court in the Ninth Circuit has opined on this precise point of law, the Ninth Circuit has found that forum selection clauses can be equally applied to contractual and tort causes of action where resolution of the tort claims relates to the interpretation of the contract. *See Manetti–Farrow, Inc. v. Gucci America*, 858 F.2d 509, 514 (9th Cir. 1988). The analytical approach adopted by the Ninth Circuit in *Manetti–Farrow*, can also be found in the Seventh Circuit's decision in *Omron Healthcare, Inc. v. Maclaren Exports, Ltd.*, 28 F.3d 600 (7th Cir.1994). In *Omron*, the court considered whether the plaintiff's trademark infringement claim was subject to a forum selection clause which provided that all disputes arising out of a distribution agreement would be litigated in the High Court of Justice in England. Omron argued that its suit arose out of trade-

mark infringement, not out of contract, and was therefore not subject to the forum selection clause. The *Omron* court rejected that argument on the basis that "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement" for purposes of a forum selection clause. *Omron*, 28 F.3d at 602. The court further found that resolution of the Omron–Maclaren dispute depended upon an understanding of the written distribution agreement between the parties and its implied terms, that Omron's claim of trademark infringement was subject to the forum selection clause, and that Omron's claims had to be litigated in England. *Id.* at 601, 604.

GTSI contends that this court should not follow the reasoning of *Manetti–Farrow, supra*, and *Omron, supra*, and points the court to a Second Circuit opinion which considered the applicability of forum selection clauses to copyright cases. *See Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679 (2nd Cir.1993); *see also Cheever v. Academy Chicago Ltd.*, 685 F.Supp. 914, 917 (S.D.N.Y. 1988). *Corcovado* stands for the proposition that "where a plaintiff sues for copyright infringement and asserts no rights under a contract with defendant containing a forum selection clause, the forum selection clause has no effect." *Corcovado*, 981 F.2d at 682,

---

infringement of those works following discovery. *See* Opposition to Motion to Dismiss or Transfer Case, fn. 3. Because GTSI has not withdrawn its claims against TPI with respect to the aforementioned copyrights by amendment of its complaint, and has stated its determination to pursue those claims in the future, the court's ruling is with respect to each of the three allegedly infringed copyrights referred to in GTSI's complaint.

7. GTSI also argues that the PSA failed to transfer ownership of any copyrights to TPI. Relying upon *Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933, 936 (N.D.Cal.1992) and *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1993), GTSI argues that the PSA fails to comply with Section 204(a), of the Copyright Act (see 17 U.S.C. § 204 (1996)) which is analogous to a statute of frauds. GTSI's argument is not persuasive. To begin with, the cases cited by GTSI fail to support its position. In *Konigsberg*, the Ninth Circuit held that a letter written three and one half years after an alleged oral assignment of a copyright was insufficient to effect a valid assignment because it was not substantially contemporaneous with the oral agreement and was

not a product of the parties negotiations. 16 F.3d at 357. The PSA is a direct result of conversations, e-mails and negotiations between Mr. Graham and TPI, and is therefore distinguishable from the *Konigsberg* case. The *Pamfiloff* decision held that a Recording Agreement and a related royalty allocation agreement failed to constitute a written copyright assignment because it did not contain the essential term pertaining to a transfer of musical compositions such as the rights to reproduce, perform, distribute, etc. 794 F.Supp. at 936. In this case, however, the PSA transfers all rights to any work in progress, hardware, software, or other materials provided by TPI to Mr. Graham for the development of rock.com, and to all other materials developed by Mr. Graham in connection with rock.com. *See* Fitch Decl., Ex. A, p. 3, ¶¶ 4.1–4.4. Furthermore resolution of whether the terms of the PSA are sufficient to constitute a valid transfer requires interpretation of the PSA. As discussed in Section III.B.1, where resolution of a dispute relates to the interpretation of a contract, a forum selection clause contained within that contract is enforceable. *See Manetti–Farrow*, 858 F.2d at 514, *see also Omron*, 28 F.3d at 602.

citing *Cheever,* 685 F.Supp. at 917 (forum selection clause does not apply where plaintiff not attempting to assert contractual rights arising from the agreement). GTSI contends that its complaint asserts no rights other than copyright infringement, and that the PSA executed by Mr. Graham and TPI is relevant only as a defense to GTSI's infringement claims against TPI. Opposition at 4:19–22. GTSI further argues that its complaint fails to seek contract remedies under state law, and that it is, therefore, not prevented from bringing suit against TPI in the Northern District of California. *Id.* at 5:3–9.

TPI, on the other hand, argues that *Corcovado* is distinguishable from the present case due to the fact that none of the parties in that case were parties to the agreement containing the forum selection clause and that the defendants sought to send the case to Brazil where the foreign court would have no particular ability to analyze and apply United States copyright laws. Reply at 8:12–16. TPI argues that in the present case both it and GTSI are parties to the PSA. *Id.* at 8:18–20 ("not only is TPI an undeniable party to the [PSA], but so, too, is the corporate plaintiff as the successor in interest of Graham and GTS"). TPI further contends that the Southern District of New York is not only capable of interpreting copyright laws, but is better suited to interpret the New York law applicable to the PSA. *Id.* at 8:16–18. TPI further argues that, even if not distinguishable, the court should decline to follow both *Cheever* and *Corcovado.* TPI argues that neither case provides a meaningful basis for rejecting the analytical approach adopted by the Ninth Circuit in *Manetti–Farrow,* and the Seventh Circuit in *Omron,* and should therefore be disregarded. *Id.* at 9:1–2. Indeed, the *Omron* opinion expressly declined to follow *Corcovado* on the grounds that the case was not persuasive:

> We concluded in *Sweet Dreams Unlimited, Inc. v. Dial–A Mattress International, Ltd.,* 1 F.3d 639, 642–43 (7th Cir.1993), that all disputes the resolution of which arguably depend on the construction of an agreement "arise out of" that agreement for purposes of an arbitration clause (citations). We cannot imagine why the scope of that phrase would differ for purposes of

a forum selection clause.... Perhaps the second circuit has a more restricted view of such language, *see Corcovado Music Corp. v. Hollis Music, Inc.,* 981 F.2d 679, 682–83 (2nd Cir.1993) . . . we find it unpersuasive.

*See Omron* 28 F.3d at 602.

 This court has considered the conflicting circuit case law addressing this issue, and determines that the better view, and the one that is consistent with the Ninth Circuit approach adopted in *Manetti–Farrow,* is the one which upholds the forum selection clause where the claims alleged in the complaint *relate to* the interpretation of the contract. *See Manetti–Farrow,* 858 F.2d at 514, *see also Omron,* 28 F.3d at 602. Moreover, the *Corcovado* case of the Second Circuit is distinguishable as set forth above.

 Although the causes of action pleaded in this case by GTSI are copyright infringement claims, resolution of this action ultimately requires interpretation of the PSA. GTSI's complaint alleges, among other things, that TPI has illegally made and distributed copies of the Real Time Audio and Video for Multiple Users, and has falsely represented that TPI developed and is the owner of the program. There is no question that GTSI's claims relate to the rights and duties enumerated in the PSA. For example, ¶¶ 4.1 through 4.4 of the PSA assigns, to TPI, ownership of all copyrights to software developed in connection with the rock.com project. The central issue in this case is whether the multiple user video and audio capabilities unique to the Real Time Audio and Video for Multiple Users computer program were included within the rock.com specifications provided by TPI to Mr. Graham and therefore developed by Mr. Graham under the terms of the PSA.

TPI claims that due to Mr. Graham's programming efforts, "source code for a camera interface in accordance with the specifications, as well as other source code in accordance with specifications for rock.com, were resident on TPI's machines." *Id.,* ¶ 15. TPI alleges that Mr. Graham developed the source code on TPI's hardware for TPI pursuant to the PSA while working on the rock.

com project. Accordingly, TPI contends that it is the owner of the computer programs it issue in this case. GTSI, on the other hand, contends that the computer programs at issue were written independently by Mr. Graham (or Mr. Fuller) and were not part of the rock.com specifications. GTSI further argues that Real Time Audio and Video for Multiple Users was not mentioned in or contemplated by the PSA. For either party to prevail in this action, it must prove that its interpretation of the PSA and the work to be completed by Mr. Graham under the terms and conditions of the PSA is correct. The causes of action alleged by GTSI relate to the central conflict over the interpretation of the PSA, and therefore fall within the scope of the forum selection clause. *See Manetti–Farrow*, 858 F.2d at 513.

### 2. *Enforceability of the PSA with Respect GTSI and/or Mr. Fuller*

Having determined that GTSI's copyright infringement claims against TPI relate to the interpretation of the PSA, the court must now consider GTSI's argument that neither it nor Mr. Fuller is a party to the PSA, and should therefore not be bound by its terms.

█ It is well established that "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *See Manetti–Farrow*, 858 F.2d at 509, *citing Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984); *see also Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202–03 (3rd Cir.) *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983). In *Manetti–Farrow*, the plaintiff argued that the forum selection clause could only apply to actual signatories of the contract. The Ninth Circuit rejected that argument, and found that the clause could be applied to non-signatories to the contract where "the alleged conduct of those non-parties is closely related to the contractual relationship." *Manetti–Farrow*, 858 F.2d at 509.

█ In the present case, both GTSI and Mr. Fuller are closely related to the contractual relationship. GTSI is the assignee of the copyrights to the computer programs allegedly developed by Mr. Graham either as a work for hire for TPI or independently. That GTSI has succeeded to any rights Mr. Graham, GTS, or Mr. Fuller may have had in the computer programs is evidenced by GTSI's filing of the present copyright infringement action. Mr. Fuller's role is not as clearly defined (was he merely a consultant to Mr. Graham in the creation of the computer programs at issue (Graham Decl., ¶ 13) or was he the author of the Real Time Audio and Video for Multiple Users program? (Supp. Graham Decl., ¶ 4)). Nevertheless, resolution of this case depends upon whether the multiple user video and audio computer program was included within the rock.com specifications provided by TPI to Mr. Graham and therefore developed by Mr. Graham under the terms of the PSA. Also a crucial factual issue is whether any work allegedly performed by Mr. Fuller was in an effort to assist Mr. Graham in fulfilling his responsibilities under the PSA, or was Mr. Fuller's own independent work. Accordingly, the conduct of GTSI and Mr. Fuller are closely related the contractual relationship between Mr. Graham and TPI, and the forum selection clause applies to both GTSI and Mr. Fuller in spite of the fact that they are not signatories to the PSA.

### IV. CONCLUSION

There is substantial evidence to infer that GTSI, the corporate plaintiff, is the successor to Graham and GTS and therefore bound by the PSA, including the forum selection clause. Forum selection clauses are prima facie valid, and are enforceable absent a strong showing by the party opposing the clause "that enforcement would be unreasonable or unjust, or that the clause [is] invalid for reasons such as fraud or overreaching." *Manetti–Farrow*, 858 F.2d at 512, *citing The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916. GTSI has made no such showing in this case. Moreover, resolution of this case inevitably depends on the construction and interpretation of the PSA executed by TPI and Mr. Graham in his capacity as the president of a California corporation called Graham Technology Solutions.

For the foregoing reasons, this action is transferred to the United States District

Court, Southern District of New York, the only proper venue under the terms of the Professional Services Agreement, pursuant to Rule 12(b)(3), Fed.R.Civ.P.

IT IS SO ORDERED.