# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-1659
_____

Vaughn Boyd; SWI-DE, LLC, doing business as Drew Estate

*Plaintiffs - Appellants*

v.

Deadwood Tobacco Company, also known as Deadwood Tobacco Company
Corporation; William Rectenwald

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of South Dakota - Western

_____

Submitted: October 22, 2025
Filed: June 8, 2026

_____

Before SMITH, KELLY, and GRASZ, Circuit Judges.

_____

SMITH, Circuit Judge.

Vaughn Boyd and the Drew Estate (collectively, Plaintiffs) sold to William
and Jodene Rectenwald the Deadwood Tobacco Company pursuant to a Stock
Purchase Agreement (Agreement), which withheld from sale three trademarks
originally registered to the Deadwood Tobacco Company. Plaintiffs later sued the
Rectenwalds and Deadwood Tobacco Company (collectively, Defendants) alleging

infringement of their reserved trademark interests pursuant to the Lanham Act. Defendants denied these allegations. The district court[1] dismissed the action on *forum non conveniens* grounds after determining Plaintiffs' claims arose out of the Agreement, which contains a forum selection clause. Plaintiffs appeal the dismissal. For the reasons discussed below, we affirm.

## I. *Background*
### A. *The Trademarks*

Founded in 1996 by Jonathan Drew and Marvin Samelin in New York, Drew Estate originates and manufactures premium cigars. It ranks as one of the largest and best-known cigar producers in the world. Drew Estate has originated numerous notable and successful cigar brands, including ACID, Liga Privada, and Isla del Sol, among others. Drew Estate also owns and operates the largest cigar factory in Nicaragua and organizes events for the premium cigar community.

Boyd founded the Deadwood Tobacco Company and Cigar Bar in 2006 in Deadwood, South Dakota. When Boyd opened her brick-and-mortar cigar shop and smoke lounge, she stocked and sold numerous brands of cigars. The store, however, did not produce any house brands.

In 2009 Drew Estate and Deadwood Tobacco Company entered into an agreement to begin a new line of store-exclusive cigars originated by Drew Estate but bearing the Deadwood Tobacco Company name. Together, these companies produced Deadwood's first house cigar, the Sweet Jane. Deadwood Tobacco Company registered a trademark with the United States Patent and Trademark Office under the mark DEADWOOD TOBACCO CO. SWEET JANE. Sweet Jane sold well, so the partners agreed to expand the line. They subsequently introduced two additional cigars under the marks DEADWOOD TOBACCO CO. FAT BOTTOM BETTY and DEADWOOD TOBACCO CO. CRAZY ALICE in 2013 and 2014,

---

[1]The Honorable Camela C. Theeler, United States District Judge for the District of South Dakota.

respectively. The partners marketed and sold these cigars under their individual marks as well as collectively under the registered marks DEADWOOD, DEADWOOD TOBACCO, and DEADWOOD TOBACCO CO.

To assist with marketing and product recognition, Drew Estate developed logos and branding for the cigars. Each cigar featured a *calavera de azúcar*, a skull motif associated with Día de Los Muertos, depicting a female character designed to represent the "strong, heartbreaking women from the brothels and barrooms of the seedy underbelly of the Old West in Deadwood, South Dakota." R. Doc. 12-1, at 4. Using this marketing, the partners also sold the cigar line under the collective mark THE YUMMY BITCHES.

All the house cigars sold well, so the partners again expanded their agreement. In 2016 Deadwood Tobacco Company granted Drew Estate an exclusive license to market and sell THE YUMMY BITCHES nationwide. Drew Estate subsequently announced the national release of the DEADWOOD brand cigars at the 2016 International Premium Cigar & Pipe Retailers Association. *Cigar Dojo*, a premium cigar industry publication, reported that "Drew Estate is making Deadwood's Three Yummy Bitches line a national release. The line includes Sweet Jane, Fat Bottom Betty, and Crazy Alice—previously a shop-exclusive for Deadwood Tobacco Co. in South Dakota." R. Doc. 12-1, at 5.

Deadwood Tobacco Company held all the trademarks under its corporate name.

B. *The Sale of Deadwood Tobacco Company*

On April 1, 2018, Boyd entered into an agreement with William and Jodene Rectenwald to sell them 99% of Deadwood Tobacco Company pursuant to the Agreement. Boyd later sold the final 1%. The Agreement expressly reserved from the sale some assets, including the trademark registrations for DEADWOOD TOBACCO CO. CRAZY ALICE, DEADWOOD TOBACCO CO. SWEET JANE, and DEADWOOD TOBACCO CO. FAT BOTTOM BETTY. The Agreement

reserved only these three marks and made no mention of the DEADWOOD, DEADWOOD TOBACCO, DEADWOOD TOBACCO CO., or THE YUMMY BITCHES marks.

Later that same day, Deadwood Tobacco Company assigned the three reserved trademarks to Boyd and filed the appropriate paperwork with the United States Patent and Trademark Office. Jodene Rectenwald signed the registration transfer agreement as CEO of Deadwood Tobacco Company, and Boyd signed as an individual.

C. *The Alleged Violations and Initial Lawsuits*

Later, Deadwood Tobacco Company, now owned by the Rectenwalds, announced new cigars under the trademarks DEADWOOD TOBACCO CO. CHASING THE DRAGON, DEADWOOD TOBACCO CO. ZERO, DEADWOOD TOBACCO CO. MIDNIGHT OIL, and DEADWOOD TOBACCO CO. AUNTIE, among others. The company announced these new products in a letter to the cigar market, which read in relevant part:

> As the originator of the "Yummy Bitches," including Sweet Jane, Crazy Alice, [and] Fat Bottom Betty . . . we felt it was time to add a new flavor profile to the lineage of greatness. With that, let me introduce you to the new line. Deadwood Tobacco Co. Chasing the Dragon is the first of its kind and boasts a rich selection of flavors never introduced to the cigar world.
>
> Just like the yummy bitches pay homage to the madams that ran the brothels in this notorious town, the DTC Chasing the Dragon name comes from the underbelly of the wild west. . . . The Auntie, Zero[,]

and Midnight Oil all carry names borrowed from the street slang for opium at the time.

R. Doc. 12-1, at 11 (citation modified).

Upon reading the letter, Plaintiffs informed Deadwood Tobacco Company that they believed these marks and representations violated the trademark interests that they reserved as part of the Agreement. After the parties failed to reach a resolution, Plaintiffs filed suit in federal district court in Florida. That lawsuit brought federal and state trademark claims. It also included a declaratory action to settle the contract disputes arising from the various agreements between the parties, including the Agreement.

Plaintiffs' Florida-filed federal complaint asserted that Defendants violated the goodwill associated with the reserved marks through their Chasing The Dragon line. They also alleged violations based on use of DEADWOOD, DEADWOOD TOBACCO, and DEADWOOD TOBACCO CO. The lawsuit referred to all these marks collectively as the "Infringing Marks." *Id.* at 10.

The Florida federal court did not reach the merits of Plaintiffs' claims. Thus, it made no findings regarding ownership or the associated rights of the various marks. Instead, that court determined that Plaintiffs' claims arose out of the Agreement, as that agreement purported to assign and reserve various trademarks associated with the sale of Deadwood Tobacco Company. Over Plaintiffs' objections, the Florida federal district court dismissed the action on *forum non conveniens* grounds. The court relied on the forum selection clause in the Agreement. That clause provides:

> Venue and Jurisdiction. Venue for any dispute arising out of this Agreement shall be in Lawrence County, South Dakota, and the circuit

court in Lawrence County, South Dakota shall have jurisdiction over the parties and subject matter of the dispute.

R. Doc. 12-2, at 16. The Agreement also contains a choice-of-law provision stating that it "shall" be construed according to the laws of South Dakota. *Id.*

Following dismissal of the Florida suit, Defendants filed suit in South Dakota state court relying on the forum selection clause in the Agreement. They sought resolution of the contractual disputes.

## D. *The Present Lawsuit*

As the South Dakota state court suit proceeded, Plaintiffs brought this federal action in the District of South Dakota. This suit differs from the Florida federal lawsuit. Specifically, Plaintiffs here pleaded only federal Lanham Act claims. They also did not include the Agreement in their pleadings, electing instead to merely mention the Agreement without making it part of the court's record. Plaintiffs also listed the marks that they dispute, this time including the "THE YUMMY BITCHES" mark as one of those allegedly infringed. Defendants provided the district court with the full Agreement in their response.

Upon examination, the South Dakota district court came to the same conclusion as the Florida court: dismissal. It first determined that the disputes arose out of the Agreement. It next found that the forum selection clause was valid and then interpreted it as mandatory. Finally, it elected to enforce the clause. Thus, it dismissed the suit. This appeal followed.

## II. *Discussion*

On appeal, Plaintiffs advance three principal arguments. First, they contend that their trademark rights arise solely under federal law—the Lanham Act—and therefore cannot depend on the Agreement. In their view, trademark rights do not

originate from contract, and the district court therefore erred by relying on the parties' Agreement as the source of their trademark rights' claims.

Second, Plaintiffs assert that, even assuming the Agreement is relevant, the district court erred in its interpretation of its forum selection clause. Plaintiffs argue a proper reading of the Agreement reveals a permissive rather than mandatory construction for the clause. Alternatively, they maintain that, even if construed as mandatory, the clause merely authorizes state court jurisdiction but does not preclude federal jurisdiction.

Third, Plaintiffs contend that the district court erred in enforcing the clause, even with a mandatory construction, because doing so violates the public policy of the federal courts. Specifically, they argue that the federal courts alone ought to hear trademark disputes given the Lanham Act's national significance and the substantial economic importance of trademark rights and their enforcement. They contend that the district court erred by sending their dispute to the state courts of South Dakota.

A. *Standard of Review*

The parties dispute the district court's determination as to the applicability of the Agreement, as well as that court's construction and enforcement of the Agreement's forum selection clause. Therefore, we review the district court's conclusions on each point.

We review a district court's determination that a given contract applies to a dispute between the parties de novo, as it is a question of law. *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 83 F.3d 1013, 1017 (8th Cir. 1996) (stating that "the meaning of the terms in the [disputed agreement], and their application to the facts in this case, are legal questions over which we exercise plenary review").

We also review the district court's findings as to the validity and interpretation—including meaning, scope, and applicability—of a forum selection clause de novo, as these are also questions of law. *Terra Int'l, Inc. v. Miss. Chem.*

*Corp.*, 119 F.3d 688, 691–92 (8th Cir. 1997) (treating interpretation and scope of a forum selection clause as contract-construction issues reviewed de novo); *Servewell Plumbing, LLC v. Fed. Ins. Co.*, 439 F.3d 786, 788 (8th Cir. 2006); *see also Wilbur-Ellis Co. v. Erikson*, 103 F.4th 1352, 1355 (8th Cir. 2024) ("Contract interpretation is a question of law we review de novo.").

Finally, we review the district court's determination of whether to enforce the forum selection clause for an abuse of discretion. *Sun World Lines v. March Shipping Corp.*, 801 F.2d 1066, 1068 n.3 (8th Cir. 1986); *see also Terra Int'l*, 119 F.3d at 691–92.

## B. *The Trademark Interests*

Plaintiffs argue that the district court committed reversible error "in ruling that the [Agreement's] forum selection clause controlled which court had jurisdiction over [their] Lanham Act Claims." Appellants' Br. 14. Plaintiffs contend that the Agreement governs only those claims that arise out of it, and because their trademark rights existed prior to that Agreement, resolution of disputes surrounding those marks fall outside the Agreement's scope. They thus characterize the issue as simply whether the use of the DEADWOOD TOBACCO CO. CHASING THE DRAGON, DEADWOOD TOBACCO CO. AUNTIE, and related marks were "confusingly similar to marks owned by Ms. Boyd and whether Appellees falsely claimed designation of origin by communicating to the public that their products were part of Plaintiffs' line of products." *Id.* at 16. "Thus," Plaintiffs continue, "the [Agreement] is not relevant to this case . . . nor is any interpretation of the [Agreement] necessary to determine ownership of the registered trademarks at issue in this case or to evaluate the federal Lanham Act claims . . . ." *Id.* Plaintiffs maintain that because they have held these marks since their inception, the Agreement made no change to their ownership and therefore cannot govern the present dispute. In

other words, the Agreement merely recognized the status quo: Boyd owned, had always owned, and would continue to own, the three Deadwood marks.

The question presented, however, is not whether the Agreement created trademark interests vis-à-vis the parties. The question is whether adjudicating Plaintiffs' Lanham Act claims requires examination of the Agreement. We will examine how the Lanham Act affects trademark disputes that involve contractual transfer of the marks.

### 1. *Trademarks and Goodwill*

A trademark identifies the source of goods or services and distinguishes the producer or provider from others. *See, e.g.*, *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918). Courts have stated this principle for more than a century: a trademark is "a symbol or a device" used by an artisan or producer to designate origin and to separate her goods from competing offerings. *In re Trade-Mark Cases*, 100 U.S. 82, 92 (1879); *see Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916) (stating that trademarks exist "to identify the origin or ownership of the article to which it is affixed"). Contemporary precedent continues to follow the same rule. Distinctive marks enable consumers to recognize the goods that they want and avoid the ones that they do not. *See Vidal v. Elster*, 602 U.S. 286, 305 (2024); *Matal v. Tam*, 582 U.S. 218, 224 (2017). A mark gains legal significance only when it performs this source-identifying role; it operates as a symbol whose value arises from the association it conveys. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others.").

Goodwill refers to the commercial reputation and customer association that a business generates through use of a mark. *See United Drug*, 248 U.S. at 97; *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 287 (8th Cir. 1969). The law protects the mark only because it symbolizes that goodwill; the symbol has no force apart from the economic interest it denotes, and the law recognizes it only to the degree necessary

to protect that interest. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368–69 (1924). Put succinctly: a trademark "has no independent significance apart from the goodwill it symbolizes," and "[t]here are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).

Under the common law, trademark rights arise out of use, not "mere adoption." *United Drug*, 248 U.S. at 97. Congress follows the same principle in legislation, defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. A producer therefore creates enforceable rights only when its use of a symbol establishes a distinct commercial association in the minds of consumers. *See Vidal*, 602 U.S. at 291; *B & B Hardware*, 575 U.S. at 142; *Tam*, 582 U.S. at 225. Use binds the mark to the goodwill protected by the law, and that connection generates the protectable trademark interest. *See B & B Hardware*, 575 U.S. at 143.

### 2. *History of the Lanham Act*

"[F]ew human institutions can boast a more respectable antiquity" than the trademark. Edward S. Rogers, *Some Historical Matter Concerning Trade-Marks*, 9 Mich. L. Rev. 29, 29 (1910); *see Tam*, 582 U.S. at 224 ("Trademarks and their precursors have ancient origins . . . ."). Early American courts inherited from England a longstanding practice of protecting source-identifying marks, and by the time of the Founding, both common law and equity recognized trademark interests as enforceable property rights appurtenant to goodwill. *Vidal*, 602 U.S. at 287. For much of the nation's history, however, trademark disputes remained the province of state courts because Congress had not enacted a comprehensive federal statute. *See Tam*, 582 U.S. at 224. The inconsistent landscape of state laws created challenges for the business community, and early efforts by Congress to bring unity to the system failed. *See id.* ("Eventually, Congress stepped in to provide a degree of national uniformity, passing the first federal legislation protecting trademarks in 1870."); *see also Trade-Mark Cases*, 100 U.S. at 87 (striking down the federal Trademark Act of 1870 as unconstitutional but noting that trademarks, "in order to

their efficiency require, uniformity of regulation"); *see generally* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:8 (5th ed.) [hereinafter *McCarthy*] (tracing the history of state common law trademark protection and the commercial pressures that drove federal legislation). Congress ultimately responded in 1946 by adopting the Lanham Act, a nationwide system designed to bring uniformity to registration and enforcement while preserving the common-law principle that trademark rights originate in use. *Id.*; Act of July 5, 1946, ch. 540, 60 Stat. 427.

The Lanham Act federalized trademark law, but it did not displace the common-law foundation of trademark rights, nor did it disturb how the rights originate. The Act presupposes that rights arise from use and the goodwill that use generates. Its statement of purpose, codified in § 45, describes the regulatory aim of eliminating deceptive and misleading uses of marks in commerce, protecting registered marks from state interference, and furnishing uniform federal remedies for unfair competition. 15 U.S.C. § 1127. Thanks to the "unusual[] and extraordinarily helpful" statement of purpose in the statute, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) (citation modified), "[i]t requires no guesswork to ascertain Congress' intent regarding this federal law," *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014) (citation modified).

### 3. *Federal Registration Under the Lanham Act*

The Lanham Act created a registration system that implements the Act's goals by supplying evidentiary and procedural advantages—constructive notice, prima facie validity, and nationwide priority—to mark holders. However, this system follows the same presuppositions as the rest of the act and leaves the substantive, common-law origin of rights untouched. A mark must be "use[d] . . . in commerce" before it can be registered, and registration "is not mandatory" because owners of unregistered marks may still enforce their rights under both the Lanham Act and the common law. *Vidal*, 602 U.S. at 291 (citation modified). The Lanham Act therefore protects trademarks that already exist: "[F]ederal law does not create trademarks."

*B & B Hardware*, 575 U.S. at 142. Thus, use creates the protectable interest, *United Drug*, 248 U.S. at 97, goodwill defines its scope, *see PepsiCo*, 416 F.2d at 287, and registration merely records the associated rights that necessarily preexist, *see, e.g.*, *Tam*, 582 U.S. at 225–26; *see generally Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed. Cir. 2015) ("The registration of a mark that does not meet the use in commerce requirement is void ab initio. The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." (citation modified)); *Application of Desiter Concentrator Co.*, 289 F.2d 496, 501 (C.C.P.A. 1961) ("It is trite to say that the Lanham Act does not create trademarks. While it may create some new substantive rights in trademarks, unless the trademarks pre-exist there is nothing to be registered.").

Lanham Act registration establishes that the applicant owns a mark used in commerce; it does not determine whether a transaction transferred or retained the goodwill that gives the mark its legal force. *United Drug*, 248 U.S. at 97; *see PepsiCo*, 416 F.2d at 287. Because trademark rights arise from use and the consumer goodwill generated by that use, registration alone cannot establish a protectable interest. *See, e.g.*, *PepsiCo*, 416 F.2d at 287.

### 4. *Assignments of Trademark Interests*

Relatedly, a trademark cannot be assigned except in tandem with the transfer of the underlying business and goodwill with which it is associated. *Bulte v. Igleheart Bros.*, 137 F. 492, 499 (7th Cir. 1905) ("The good will is inseparable from the business itself. . . . Therefore it is . . . a necessary qualification to the assignability of a trade-mark that there goes with it the transfer of the business and good will of the owner of the symbol."). A court reviewing a transfer must therefore necessarily first find the underlying goodwill and identify who owns it. *See PepsiCo*, 416 F.2d at 289–90 (discussing how "[t]he evidence is clear" that party seeking to transfer trademark "did not intend to adopt or exploit any 'goodwill' from the" mark purportedly transferred). And since registration alone does not create or convey a trademark, a reviewing court must look past formal registered title and examine whether a transaction truly conveyed the underlying business, customer

relationships, and commercial reputation that the mark must represent. *See, e.g.*, *Bulte*, 137 F. 492 at 498–99 (examining whether trademark transfer included underlying business); *Indep. Baking Powder Co. v. Boorman*, 175 F. 448, 453 (C.C.D.N.J. 1910) (discussing how transfer of multiple trademarks associated with the same product would cause confusion for the public).

Contracts that appear to assign (or reserve) trademark interests provide fertile starting ground for this inquiry. *See, e.g.*, *Indep. Baking Powder*, 175 F. at 452–53 (discussing the "instrument" and "contract" underlying previous cases). A contract, like registration, does not create trademark interests, but it can assign them. *United Drug*, 248 U.S. at 97; *PepsiCo*, 416 F.2d at 299. Nevertheless, assignments of extant trademarks unaccompanied by the underlying goodwill are void. *United Drug*, 248 U.S. at 97; *PepsiCo*, 416 F.2d at 299; 15 U.S.C. § 1060; *accord. Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999) (holding an assignment void because goodwill did not accompany the mark); *Bulte*, 137 F. 492, 498–99 (invalidating transfer where the underlying business did not convey). The Lanham Act requires as much: Any transfer of a trademark must go "with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark." 15 U.S.C. § 1060(a)(1).

### 5. *Assignment of the DEADWOOD Marks under the Agreement*

Here, Boyd sold the Deadwood Tobacco Company to the Rectenwalds pursuant to the Agreement. That Agreement explicitly reserved from sale several marks including the DEADWOOD TOBACCO CO. SWEET JANE, DEADWOOD TOBACCO CO. CRAZY ALICE, and DEADWOOD TOBACCO CO. FAT BOTTOM BETTY marks. Because trademarks must attach to goodwill and cannot otherwise exist, the Agreement's reservation of these trademarks necessarily did one of two things. On the one hand, it may have been a nullity and accomplished nothing because no goodwill accompanied it. *United Drug*, 248 U.S. at 97; 15 U.S.C. § 1060(a)(1). Or, on the other hand, the reservation may have functioned as a retention of some portion of the business and its associated goodwill sufficient to support continued ownership of those marks. *Cf., e.g.*, *PepsiCo*, 416 F.2d at 290

(holding that assignment is only valid when the assignee acquires the underlying business or product line to which the mark's goodwill attaches). Thus, by reserving certain marks while conveying the rest of the company, including closely related and associated marks such as THE YUMMY BITCHES and DEADWOOD TOBACCO CO., Plaintiffs either retained the goodwill necessary to support the reserved marks or failed to reserve them at all.

The Agreement matters in determining which of these outcomes occurred. *See Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) ("[A]ll disputes the resolution of which arguably depend on the construction of an agreement arise out of that agreement." (citation modified)). A finder of fact will need to determine the scope of the parties' transaction. To do so, they will need to look to the Agreement, and other relevant agreements between the parties, to determine what goodwill Boyd reserved, if any. This is true regardless of the undisputed ownership of the three marks—Sweet Jane, Fat Bottom Betty, and Crazy Alice. Based on the foregoing, we agree with the district court that the Plaintiffs' claims arise out of the Agreement even though they are federal Lanham Act claims. *See Omron*, 28 F.3d at 604.

## C. *The Forum Selection Clause*

A forum selection clause enables contracting parties to choose in advance where they will litigate any disputes arising from their agreement. *See, e.g.*, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12–14 (1972); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) (discussing fundamental fairness inquiry). A proper clause narrows the available litigation forums. *E.g.*, *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 59–60 (2013). We enforce these clauses provided they comport with justice. *Dominium Austin Partners v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001) ("[A] forum selection clause is enforceable unless it is invalid or enforcement would be unreasonable and unjust.");

-14-

*M.B. Restaurants, Inc. v. CKE Restaurants, Inc.*, 183 F.3d 750, 752 (8th Cir. 1999) (stating that clauses may be unjust if they deprive a party of their "fair day in court").

### 1. *Parsing a Forum Selection Clause*

The enforcement of a forum selection clause largely turns on three analytically different considerations: (1) validity of the agreement; (2) applicability to covered disputes; and (3) feasibility and practicability of enforcement. *See Atl. Marine*, 571 U.S. at 62–68 (assuming a "contractually valid" clause and then describing a modified § 1404(a) and *forum non conveniens* analysis for enforcement). Validity and interpretation present questions of substantive contract law, ordinarily governed by the law that would apply to the contract under the forum's choice-of-law rules or under an applicable choice-of-law clause. We generally treat enforceability, on the other hand, as a matter of federal procedure in federal courts, addressed by *The Bremen*, 407 U.S. at 10; *Stewart*, 487 U.S. at 29–32; and *Atlantic Marine*, 571 U.S. at 62–67.

### a. *Choice of Law and Validity*

We first address the contractual validity of the forum selection clause. *See, e.g.*, *Vulcan Cap. Corp. v. Miller Energy Resources, Inc.*, No. 13-cv-8751, 2014 WL 4384159, at *2 (S.D.N.Y. Sept. 4, 2014) ("When assessing a motion to transfer on the basis of a forum-selection clause, a court must first determine whether the forum-selection clause is valid and enforceable."). We apply state contract law to determine the validity of a forum selection clause, using the law that would ordinarily govern the contract under the forum's choice-of-law rules or under the applicable law of the contract. *See Dunne, v. Libbra*, 330 F.3d 1062, 1064 (8th Cir. 2003) (applying Illinois contract law contracted for in the agreement); *accord Barnett v. DynCorp Int'l, LLC*, 831 F.3d 296, 301–02 (5th Cir. 2016). When neither party challenges the clause's formation or validity as a matter of state law, we treat the issue as waived and proceed directly to interpretation and enforcement under the appropriate governing standards. *See Servewell*, 439 F.3d at 788 (declining to address "meaning,

scope, or applicability of the forum selection clause" where "parties do not dispute" them). Here, neither party disputes validity, so the issue is waived.

b. *Choice of Law and Interpretation*

Our sister circuits disagree as to which body of law governs interpretation. *Compare Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) ("We apply federal contract law to interpret the scope of a forum-selection clause even in diversity actions."), *with Martinez v. Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014) ("[W]here a contract contains both a valid choice-of-law clause and a forum selection clause, the substantive law identified in the choice-of-law clause governs the interpretation of the forum selection clause, while federal law governs the enforceability of the forum selection clause."); *Albemarle Corp. v. AztraZeneca UK Ltd.*, 628 F.3d 643, 648–51 (4th Cir. 2010) (applying chosen law to interpretation and federal law to enforcement). But we held in *Dunne* that the interpretation of a forum selection clause is a question of state law, typically contracted for by the parties, and reviewed de novo. 330 F.3d at 1064.

Our review includes the meaning of the clause's terms, its mandatory versus permissive character, and its scope. *Servewell*, 439 F.3d at 788. "[T]he meaning, scope, [and] applicability of the forum selection clause . . . [are] questions of contract interpretation . . . ." *Id.* (citing *Rainforest Cafe Inc. v. EklecCo*, 340 F.3d 544, 546 (8th Cir. 2003); *Dunne*, 330 F.3d at 1063). We need not rely on the parties' urging or encouragement to apply state law to questions of contract interpretation, as under *Erie*[2] principles, state law governs interpretation and validity; federal law governs enforcement. *See, e.g.*, *M.B. Restaurants*, 183 F.3d at 752 (discussing the "disagreement among the circuits regarding whether [enforcement of a forum selection clause] is a procedural question governed by federal law or a substantive question governed by state law under" *Erie*); *see generally Erie*, 304 U.S. at 78.

---

[2]*Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

c. *Choice of Law and Enforcement*

Our treatment of enforcement has been less straightforward historically. Our analysis began with *Sun World Lines, Ltd. v. March Shipping Corp.*, 801 F.2d 1066 (8th Cir. 1986), an admiralty case. There, in dictum, we stated that "[t]he enforceability of a forum selection clause" was a federal question governed by *The Bremen*'s presumption of applicability rather than Missouri's hostile public-policy, even in diversity cases. *Id.* at 1068–69. But months later, we abandoned this dictum in *Farmland Industries, Inc. v. Frazier-Parrott Commodities, Inc.*, 806 F.2d 848 (8th Cir. 1986). In *Farmland* we held that state policy can control whether to enforce a forum selection clause, but we did not settle the question fully. *Id.* at 852. It remained unaddressed until the early 2000s. *See, e.g.*, *Rainforest Cafe*, 340 F.3d at 546.

We ultimately determined that whether to enforce a forum selection clause is a question of procedure, and so a federal court sitting in diversity must apply the federal *The Bremen* standard. *Union Elec. Co. v. Energy Ins. Mutual Ltd.*, 689 F.3d 968, 973 (8th Cir. 2012). But we also held that federal district courts must perform a *Farmland* analysis and consider "the public policy of the forum state" as part of its decision whether to enforce the clause. *Id.* at 974.

The Supreme Court's decision in *Atlantic Marine Construction Co. v. United States District Court for the W.D. Tex.*, 571 U.S. 49 (2013), clarified the federal side of the enforcement analysis around a modified § 1404(a) and *forum non conveniens* framework in which valid forum selection clauses receive "controlling weight in all but the most exceptional cases." *Id.* at 60.

Read together, these decisions look to state contract law to resolve questions of validity and construction of forum selection clauses. Federal law governs whether the state court's construction will be enforced, with state policy incorporated as a possible *The Bremen* exception through *Farmland*.[3] That is, state interests may

---

[3]Other courts have agreed that looking to state public policy is a valid exercise under federal common law. *See, e.g.*, *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 497 (9th Cir. 2000).

provide an exceptional case not to apply the clause, and district courts must consider them. *See Atl. Marine*, 571 U.S. at 60; *Union Elec. Co.*, 689 F.3d at 973 (requiring that district courts must give "due consideration" to state public policy).

### 2. *Interpretation of the Agreement's Forum Selection Clause*

Plaintiffs seek reversal of the district court's interpretation of the Agreement's forum selection clause. They advance a permissive reading that favors, but does not require, bringing claims in the state court; they further assert that the clause fails to strip other courts, and in particular federal court, of jurisdiction. Plaintiffs also argue that the mandatory construction runs afoul of national public policy; namely, that federal courts enforce a party's right to litigate in a federal forum, particularly when the cause involves federal law. Defendants, on the other hand, support the district court's mandatory construction and argue that the clause bars any other court from hearing the dispute.

Having determined that Plaintiffs' claims arise out of the Agreement, we will give effect to the choice-of-law provision and apply South Dakota law to interpret the Agreement, as the Agreement's choice-of-law provision provides. South Dakota courts apply "the law of the state chosen by the parties." *Northland Cap. Fin. Servs., LLC v. Robinson*, 976 N.W.2d 252, 256 (S.D. 2022) (citation modified).

South Dakota courts interpret contracts seeking to effectuate the parties' intent according to the plain meaning of the agreement's terms. *See Bunkers v. Jacobson*, 653 N.W.2d 732, 738 (S.D. 2002). Courts aim "to ascertain and give effect to the intention of the parties." *Read v. McKennan Hosp.*, 610 N.W.2d 782, 786 (S.D. 2000) (quoting *Malcolm v. Malcolm*, 365 N.W.2d 863, 865 (S.D. 1985)); *accord Kimball Inv. Land, Ltd. v. Chmela*, 604 N.W.2d 289, 293 (S.D. 2000). Determining the parties' intent requires studying the contract and giving "terms 'their plain and ordinary meaning.'" *Harms v. Northland Ford Dealers*, 602 N.W.2d 58, 61 (S.D. 1999) (quoting *Econ. Aero Club, Inc. v. Avemco Ins. Co.*, 540 N.W.2d 644, 645 (S.D. 1995)). Courts in South Dakota do not presume ambiguity, but whether a contract is

ambiguous is a question of law. *Pesicka v. Pesicka*, 618 N.W.2d 725, 726 (S.D. 2000).

In South Dakota, ambiguity exists only where a term "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Divich v. Divich*, 640 N.W.2d 758, 761 (S.D. 2002) (quoting *Singpiel v. Morris*, 582 N.W.2d 715, 719 (S.D. 1998)); *see also Poeppel v. Lester*, 827 N.W.2d 580, 584 (S.D. 2013) ("When the words of a contract are clear and explicit and lead to no absurd consequences, the search for the parties' common intent is at an end." (quoting *Detmers v. Costner*, 814 N.W.2d 146, 151 (S.D. 2012))). When provisions conflict and harmonization strains the text, courts deem "the more specific clauses . . . to reflect the parties' intentions—a specific provision controls a general one." *AFSCME-Loc. 1025 Sioux Falls Sch. Maint. & Custodial Workers v. Sioux Falls Sch. Dist.*, 605 N.W.2d 811, 813–14 (S.D. 2000) (quoting *State v. Greger*, 559 N.W.2d 854, 864 (S.D. 1997)).

Applying these principles of South Dakota law, we hold that the forum selection clause is unambiguous. The clause states plainly that the "circuit court in Lawrence County, South Dakota shall have jurisdiction" over all disputes. R. Doc. 12-2 at 16; s*ee Pesicka*, 618 N.W.2d at 726; *Divich*, 640 N.W.2d at 761. The meaning of "shall," is the focus of the fight. Black's Law Dictionary lists several possible meanings but favors a mandatory sense:

> 1. Has a duty to; more broadly, is required to <the requester shall send notice> <notice shall be sent>. • This is the mandatory sense that drafters typically intend and that courts typically uphold.
>
> 2. Should (as often interpreted by courts) <all claimants shall request mediation>.
>
> 3. May <no person shall enter the building without first signing the roster>. • When a negative word such as *not* or *no* precedes *shall* (as in

the example in angle brackets), the word *shall* often means *may*. What is being negated is permission, not a requirement.

*Shall*, Black's Law Dictionary (12th ed. 2024).

On this record, we accord the word "shall" its ordinary mandatory sense.[4] *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning." (citation modified)).

As for Plaintiffs' secondary argument that a mandatory construction does not foreclose other courts, we disagree. The clause unambiguously states the parties' intent that the state court in Lawrence County hear disputes arising out of the agreement. Plaintiffs take issue with the district court's finding that, because no federal court sits in Lawrence County, the clause could not refer to a federal court. They argue that the language can support jurisdiction for the federal court that has

---

[4]Plaintiffs raised *Dunne* at oral argument for the proposition that "shall" may mean "may" in this circuit, but the case holds the opposite. Oral Argument at 21:00, *Boyd v. Deadwood Tobacco Co.* (8th Cir. 2025) (No. 25-1659), https://media-oa.ca8.uscourts.gov/OAaudio/2025/10/251659.MP3. In *Dunne*, this court discussed a clause containing both choice of law and consent to jurisdiction language. 330 F.3d at 1063 ("The forum selection clause provides, '[t]his agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois, and the parties consent to jurisdiction to [sic] the state courts of the State of Illinois.'" (alterations in original)). This court split the clause into two parts: the choice of law provision, which contains the word "shall," and the consent to jurisdiction provision, which does not. For the second provision, we found, applying Illinois law, "no language that has an ordinary meaning that would suggest exclusivity." *Id.* at 1064. We made this determination through a comparison to "the immediately preceding choice of law provision, which unambiguously mandates the application of Illinois law for the purpose of construing the contract," because of its use of the word "shall." *Id.*

-20-

jurisdiction over Lawrence County. We again disagree. The clause states that the "circuit court" in Lawrence County "shall have jurisdiction." R. Doc. 12-2, at 16. The phrase "circuit court" eliminates a federal district court. *See Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009) (interpreting forum selection clause that refers to a specific county that does not have a federal court to mean the parties agreed to a specific forum that was not federal); *City of Albany v. CH2M Hill, Inc.*, 924 F.3d 1306, 1308 (9th Cir. 2019) (holding that "[a]n agreement limiting venue for litigation to a particular county unambiguously prohibits litigation in federal court when there is no federal courthouse located in the designated county").

### 3. *Enforcement of the Agreement's Forum Selection Clause*

Because the forum selection clause is mandatory, not permissive, we next determine whether the district court erred by enforcing it. We make this determination applying federal common law, and we review for an abuse of discretion. The district court did not correctly consider the state policy interests, but it did not abuse its discretion.

### a. *Federal Common Law Mandates Enforcement of the Agreement's Forum Selection Clause*

When a "contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum," that clause "should be given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 63 (citation modified). This rule favors the parties' "legitimate expectations and furthers vital interests of the justice system." *Id.* Parties agree to these clauses "presumably in exchange for other binding promises," and so the plaintiff "has effectively exercised its 'venue privilege' before a dispute arises." *Id.* Therefore, "the plaintiff's choice of forum merits no weight." *Id.* Moreover, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected

forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64.

Instead, "a district court may consider arguments about public-interest factors only," *id.*, which may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law," *Atl. Marine*, 571 U.S. at 63 n.6 (citation modified). District courts must also consider the public policy interests of the forum state to ensure that applying the forum selection clause respects the law and policy of that state. *See Farmland*, 806 F.2d at 852; *Union Elec. Co.*, 689 F.3d at 974. Here, the district court did not consider the state interests, but the parties did not brief them. On this record, any error on the district court's part is harmless. We discern no abuse of discretion in the district court's enforcement of the Agreement's forum selection clause.

b. *South Dakota Law and Policy do not Bar Enforcement Pursuant to* Farmland *and* Atlantic Marine

The district court did not consider the public policy of South Dakota as required under *Farmland*. This error, however, was harmless because the outcome would not change if the court had considered it. *See* Fed. R. Civ. P. 61; *cf. Strong v. Mercantile Trust Co., N.A.*, 816 F.2d 429, 432 (8th Cir. 1987).

South Dakota law generally favors forum selection clauses. Its Supreme Court has said as much, stating "that when the parties to a contract agree that actions arising from that contract will be brought in a particular jurisdiction, that agreement should be given effect unless it is shown that to do so would be unfair or unreasonable." *Green v. Clinic Masters, Inc.*, 272 N.W.2d 813, 815 (S.D. 1978). South Dakota courts employ a four-factor test for determining the reasonableness of a forum selection clause: "(1) the law which governs the formation and construction of the contract; (2) the residency of the parties; (3) the place of execution and/or performance of the contract; and (4) the location of the parties and witnesses involved in the litigation." *Baldwin v. Heinold Commodities, Inc.*, 363 N.W.2d 191,

194 (S.D. 1985). An otherwise reasonable clause remains "subject to invalidation by overriding public policy considerations," however. *Id.* at 195. "The primary sources for declarations of . . . South Dakota public policy . . . are the constitution, statutory law and judicial decisions." *State ex rel. Meierhenry v. Spiegel, Inc.*, 277 N.W.2d 298, 300 (S.D. 1979). "[A]ny contract provision which is contrary to an express statute or to the policy of an express statute is unlawful." *Id.*

Here, the Agreement's forum selection clause passes the four-factor test. The Agreement's forum selection clause violates no South Dakota public policy or demonstrates a grievous opposition to its enforcement. South Dakota law governed the formation and construction of the Agreement, as evidenced both by the location of Deadwood Tobacco Company and the choice-of-law clause. Both defendants are citizens of South Dakota, the contract centers in South Dakota, and the parties and witnesses would be in South Dakota. *See* R. Doc. 1, at 1–2; *see also Klenz v. AVI Int'l*, 647 N.W.2d 734, 737 (S.D. 2002) ("Personal jurisdiction may be obtained over a foreign defendant if the plaintiff's claim arises out of or relates to the defendant's contacts with the forum. Furthermore, a single contact with the forum is sufficient if the plaintiff's claim arises out of that contact." (citation modified)). And although the state flatly bans forum selection clauses in some instances, *see, e.g.*, S.D. Codified Laws § 57A-2A-106 (limitation on power of parties to consumer lease to choose applicable law and judicial forum); *id.* § 32-6B-49.1 (limitation on power of parties to franchise agreement to choose applicable law and judicial forum); *id.* § 58-15-50 (ban on forum selection clauses in life insurance policies), none of these exceptions apply here.

For these reasons, we affirm the findings of the district court and add only that the mandatory *Farmland* analysis with respect to enforcement does not present any exceptional circumstance pursuant to *Atlantic Marine* and is therefore harmless error.

D. *State Courts May Hear Federal Lanham Act Claims*

Plaintiffs argue that the Lanham Act contemplates exclusive federal jurisdiction for claims brought under it. We disagree and affirm the district court.

1. *Jurisdiction of the Federal and State Courts*

The Constitution vests the judicial power of the United States "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Therefore, unless Congress affirmatively grants a lower federal court authority over some case or controversy, that court lacks power to adjudicate it. *See Sheldon v. Sill*, 49 U.S. 441, 449 (1850) (holding that "Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies" in Article III).

In contrast, the state courts enjoy inherent general jurisdiction, exercising the entire juridical power of their respective sovereignties unless affirmatively limited by Congress. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477 (1981) ("[S]tate courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary."); *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990) (reaffirming the "deeply rooted presumption in favor of concurrent state court jurisdiction").

Congress may determine that certain legal issues, generally those implicating uniquely federal interests, should be reserved for the federal courts alone. *See, e.g.*, 28 U.S.C. § 1334(a) (granting federal district courts "original and exclusive jurisdiction of all cases under title 11"); 28 U.S.C. § 1338(a) (confining copyright, plant-variety, and patent cases to federal court). Nonetheless, state courts, vested with general jurisdiction, are presumed competent to adjudicate nearly all matters, including those that test the outer boundaries of law and equity alike, unless Congress clearly states otherwise. *Gulf Offshore*, 453 U.S. at 479 (explaining that federal courts will not "oust a state court from concurrent jurisdiction" absent clear

-24-

statutory language indicating Congress intended to create exclusive federal jurisdiction).

## 2. *Jurisdictional Analysis of the Lanham Act*

Congress did not restrict resolution of disputes arising under the Lanham Trademark Act to federal courts. Therefore, state and federal courts entertain concurrent jurisdiction for claims arising under the Act. *McCarthy* § 32:1; *Berlitz Schs. of Languages of Am., Inc. v. Everest House*, 619 F.2d 211, 216 (2d Cir. 1980) (holding that "state courts have concurrent jurisdiction to determine [Lanham Act] claims").[5]

## 3. *Whether Prior Circuit Precedent Limits State Court Jurisdiction*

Plaintiffs assert that prior Eighth Circuit precedent holds that "federal court[s] [are] the appropriate forum for claims arising under federal trademark law," and that therefore we are therefore bound to that conclusion. Appellants' Br. 11. Plaintiffs cite *Verizon Communications, Inc. v. Inverizon International, Inc.*, 295 F.3d 870 (8th Cir. 2002), for this. *Verizon* does not control here. *Verizon* lies within the *Brillhart* and *Wilton* line of cases governing a district court's discretion to entertain or decline declaratory judgment actions under 28 U.S.C. § 2201.[6] *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942); *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). Under these two cases, federal courts may abstain from hearing declaratory suits

---

[5]Plaintiffs filed a Federal Rule of Appellate 28(j) letter notifying this panel of activity in the ongoing South Dakota state court action. After review, we have determined that that order has no bearing on our decision here.

[6]Section 2201(a) of 28 U.S.C. provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

when parallel state proceedings exist, provided the court weighs comity, efficiency, and the usefulness of federal relief. This discretion stems from the permissive "may declare" language found in § 2201, not from a lack of jurisdiction.

In *Verizon* the telecommunications company filed a federal declaratory judgment action seeking a determination that its use of the "Verizon" mark did not infringe or dilute the rights of Inverizon International under either the Lanham Act or state law. 295 F.3d at 871–72. Inverizon filed its own state court action asserting only state law claims. *Id.* at 872. The federal district court stayed the federal action in deference to the state action, and Verizon appealed. *Id.* On appeal, this court reversed. *Id.* However, we did not find that the presence of federal issues compelled the exercise of jurisdiction, but only that the district court failed to weigh the significance of the federal claims before abstaining. *Id.* at 874 ("The district court failed to consider the fact that federal law governs the primary claims raised in the declaratory judgment suit and only issues of state law are raised in the state court action."); *see Cincinnati Indem. Co. v. A & K Constr. Co.*, 542 F.3d 623, 625 (8th Cir. 2008) ("Deciding whether to entertain a declaratory judgment action, a district court should determine if the question in controversy would be better settled in the proceedings in the state court."); *EMCASCO Ins. Co. v. Walker*, 108 F.4th 634, 637 (8th Cir. 2024) ("Beyond whether the actions are parallel, this analysis includes whether the issues are governed by federal law, whether all claims can be decided in state court, and whether all parties are joined and amenable to process there." (citation modified)).

Thus, *Verizon* and related cases do not limit trademark claims to federal courts. Instead, they merely hold that district courts must weigh the significance of the federal claims. *See Verizon*, 295 F.3d at 874. It may be true that litigants prefer to bring complicated trademark disputes in federal courts, *see McCarthy* § 32:1 ("As a matter of litigation strategy . . . most plaintiffs appear to bring [these] cases in the federal courts, perhaps on the assumption that federal judges are more likely to be familiar with problems of trademark infringement under a federal statute."), but whether a legal question is too thorny for the courts of general jurisdiction is a matter

for Congress to resolve, *see Sheldon*, 49 U.S. at 449. Moreover, as noted above, if *Verizon* held otherwise, it would directly conflict with both Supreme Court precedent and the spirit of the Constitution itself.

The district court in this case faced questions of federal law, took careful account of the lengthy procedural history and parallel state-law case, and ultimately found that the Agreement governed the disputes and mandated dismissal in favor of the parties' chosen forum. It is not relevant that the claims presented are exclusively federal; only that the district court considered this. We affirm the district court.

## III. *Conclusion*

For these reasons, we affirm the district court, noting only that the lack of a *Farmland* analysis below constituted harmless error.

KELLY, Circuit Judge, concurring, and concurring in the judgment.

The forum selection clause in the parties' Stock Purchase Agreement applies to any "dispute arising out of" the Agreement. In my view, the clause applies to Boyd's claims here because the Agreement included an obligation for the Rectenwalds—as buyers of Deadwood Tobacco Company (DTC)—to effectuate transfer of ownership of DEADWOOD TOBACCO CO. SWEET JANE, DEADWOOD TOBACCO CO. FAT BOTTOM BETTY, and DEADWOOD TOBACCO CO. CRAZY ALICE (the Cigar Trademarks) to Boyd. At the time of the Agreement, DTC—not Boyd—owned the Cigar Trademarks. Ownership is an element of Boyd's prima facie case for her trademark infringement claim. See B & B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 389 (8th Cir. 2009) (explaining the first element of a trademark infringement claim is "establish[ing] ownership in a legally protectible mark" (citation omitted)). As a result, her suit "arises out of" the Agreement and falls within the scope of the Agreement's mandatory forum selection clause. For this reason, while I concur in the Court's opinion, I concur only in the judgment as to Parts II.B–C.1 and C.3.

To the extent the parties dispute the appropriate test for determining whether a claim "arises out of" a contract, the dispute is immaterial to resolving this issue. Compare IAC/InterActiveCorp v. Roston, 44 F.4th 635, 641 (7th Cir. 2022) ("[W]hen resolving disputes arguably depends on the construction of an agreement, those disputes 'arise out of' that agreement."), with Phillips v. Audio Active Ltd., 494 F.3d 378, 391 (2d Cir. 2007) ("Because the . . . contract is only relevant as a defense in this suit, we cannot say that [Plaintiff's] . . . claims originate from, and therefore 'arise out of,' the contract."), and Reading Health Sys. v. Bear Sterns & Co., 900 F.3d 87, 99 (3rd Cir. 2018) (holding that "arising out of" is equivalent to "originat[ing] from a specified source"). Even under the more restrictive interpretation of "arising out of," see Phillips, 494 F.3d at 390–92; Reading Health Sys., 900 F.3d at 98–100, Boyd's claims here "arise out of" the Agreement.

Prior to the Agreement, Boyd had no individual ownership interest in the Cigar Trademarks. Instead, they were owned by DTC. Section 5 of the Agreement then obligated the Rectenwalds to "cooperate and assign to [Boyd] . . . on behalf of [DTC], all intellectual property rights in the trademarks identified in Exhibit B," which included the Cigar Trademarks at issue here. Therefore, Boyd's personal ownership interest in the Cigar Trademarks—a necessary element in Boyd's prima facie case—both depends on and originates from the Agreement, because it was the Agreement that created the obligation to assign the Cigar Trademarks to her. See Reading Health Sys., 900 F.3d at 99. Boyd's claims "arise out of" the Agreement, and she is bound by its mandatory forum selection clause.

I also note that Boyd first brought the claims at issue here in a lawsuit filed in the Southern District of Florida. That court dismissed the claims on the grounds that they arose out of the parties' contracts, including the Agreement. Boyd v. Deadwood Tobacco Co., No. 23-CV-22215, 2024 WL 940822, at *6–7, *11 (S.D. Fla. Mar. 5, 2024). In doing so, the court relied on Boyd's Complaint, which alleged that defendant DTC was "disregarding the terms of the contracts in an effort to invalidate [her] contractual rights." Id. at *7 (citation modified). The court also cited to the relief Boyd sought in the case, which included a declaratory judgment that she had

-28-

not breached any of the various contracts—including the Agreement—and that the contracts themselves were enforceable. Id.

Boyd excised these prayers for relief—and, indeed, any mention of the Agreement—from her complaint in this action. But we have held that "[s]trategic or artfully drawn pleadings . . . will not work to circumvent an otherwise applicable forum selection clause." Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 695 (8th Cir. 1997) (citations omitted). In Terra, the parties entered a contract with a forum selection clause that applied only to disputes arising under the contract. Id. at 690. Terra later filed a complaint alleging only tort claims, but we concluded the forum selection clause nevertheless applied. Id. at 690, 692, 695. We explained that "Terra plainly could have asserted a parallel claim for breach of contract in the same complaint," even though Terra did not. Id. at 695. Here, Boyd *did* previously allege claims based on the enforceability of the Agreement. Boyd, 2024 WL 940822, at *7. And she did so relying on the same set of facts as the claims in the instant case. See Terra, 119 F.3d at 695.

GRASZ, Circuit Judge, dissenting.

On April 1, 2018, Vaughn Boyd entered into a Stock Purchase Agreement (Agreement) to sell Deadwood Tobacco Company (DTC) to William and Jodene Rectenwald and other purchasers. The Agreement, however, did not transfer all of Boyd's assets. Instead, in an exhibit attached to the Agreement, the parties clarified that certain assets, including the trademarks at issue, were excluded from the sale. The Agreement also contained a forum selection clause providing that "Venue for any dispute *arising out of this Agreement* shall be in Lawrence County, South Dakota, and the circuit court in Lawrence County, South Dakota shall have jurisdiction over the parties and subject matter of the dispute." (Emphasis added). On the same day the Agreement was executed, DTC assigned to Boyd certain items that had been excluded from the sale, namely the right under a license agreement "to use the phrase, 'DEADWOOD TOBACCO CO.,' in association with the terms

-29-

'CRAZY ALICE,' 'SWEET JANE,' and 'FAT BOTTOM BETTY'" (collectively, the Deadwood marks).

After a dispute concerning the Deadwood marks arose, Boyd and Drew Estate commenced this action in the District Court of South Dakota. They alleged three counts under the Lanham Act for federal trademark infringement, unfair competition and false designation of origin, and cancellation of federal trademark registration. DTC filed a motion to dismiss based on the doctrine of forum non conveniens and failure to state a claim under Rule 12(b)(6). The district court issued an order granting DTC's motion to dismiss based on forum non conveniens. The district court found, as pertinent, that the forum selection clause applied because the resolution of Boyd's and Drew Estate's federal claims would require examination of the scope and nature of the sale under the Agreement.

On appeal, Boyd and Drew Estate contend this dispute does not implicate the forum selection clause. Applying de novo review, I agree and would reverse for several reasons.

First, when determining the applicability of a contractual provision like a forum selection clause, courts look at the substance of the particular claims. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 388 (2d Cir. 2007). Under the facts of this case, the forum selection clause is not implicated because the substance of the Lanham Act claims does not "arise out of" the Agreement. The Lanham Act claims brought by Boyd and Drew Estate do not derive from any action taken while the contract was being fulfilled, nor do they "depend on an understanding of the parties' written bargain and of its implied terms."[7] *Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*, 28 F.3d 600, 602 (7th Cir. 1994) (holding that a trademark dispute arose out of an

---

[7]The Agreement did not change the status quo as to the Deadwood marks' ownership. Instead, in Exhibit B to the Agreement, the parties "expressly carved out of the sale the federally registered marks" and "carved out all licensing and royalty payments from Drew Estate relating to the Deadwood Marks." Exhibit B clarified that the sale did not impact the Deadwood marks' ownership.

-30-

agreement because the agreement "implicitly licensed [the defendant] to use the [plaintiff's] marks" on products the plaintiff ordered). Rather, the claims stem from alleged infringing actions taken by DTC after the sale had been completed. The parties do not dispute Boyd's ownership of the Deadwood marks. Therefore, the substance of their claims requires examination of the actions taken by DTC and the trademarks at issue, not the Agreement.

That the claims do not arise under the Agreement becomes even more clear when one examines the specific elements of the claims at issue. The Lanham Act "creates a federal civil cause of action for unauthorized use of a registered trademark." *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC.*, 845 F.3d 1246, 1248 (9th Cir. 2017). In order to state a claim for trademark infringement under the Lanham Act, the plaintiff must show that (1) the plaintiff has a protectible ownership interest in the mark, or for some claims, a registered mark; (2) the defendant used the mark "in connection with" goods or services; and (3) that use of the mark is likely to cause confusion. 15 U.S.C. §§ 1114(1)(a), 1125(a); *see also B&B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009).

The first element, ownership interest, would likely be proven by the trademark registrations and assignments. The last two elements, use and confusion, would simply not involve the Agreement. If Boyd and Drew Estate were to succeed on their federal trademark claims, the Agreement would remain undisturbed. *See Phillips*, 494 F.3d at 391. Even if the Agreement were to somehow become relevant, for example, as a defense to ownership, the claims at this stage do not implicate the Agreement. *See id.* (finding that where a contract is only relevant as a defense, the court "cannot say that [the] copyright claims originate from, and therefore 'arise out of,' the contract"). Likewise, even if the Agreement was a consideration in determining the ownership of the Deadwood marks (although ownership has not been disputed), simply because the Agreement is relevant to the analysis does not mean the parties' rights arise out of it.

-31-

Second, I believe the majority's discussion of goodwill and the consequent implication is flawed. The majority concludes that the trademark dispute arises out of the Agreement because "trademarks must attach to goodwill and cannot otherwise exist." *Ante* p. 13. In my view, that concept does not apply here. As the majority acknowledges, the Agreement did not transfer the Deadwood marks. *Id.* at 3–4. Exhibit B to the Agreement clarified this understanding. Since the sale did not transfer the Deadwood marks, no goodwill is required to accompany a non-transfer. *See, e.g.*, *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1062 (2d Cir. 1985) ("The fundamental error in defendants' position is their assumption that a business' goodwill and the mark symbolizing it are lost whenever the business loses its tangible assets or ceases active conduct of its operation. If that were the case, the destruction of a business' factory or its bankruptcy would terminate its goodwill, even though it resumed business and use of the mark after reconstruction of the plant or emergence from bankruptcy."). Phrased differently, trademark rights do not pass in general asset or capital sales, unless expressly assigned. Only when trademarks are assigned is goodwill required to accompany them.

Third, decisions from other circuits support this reasoning. In *Phillips*, the musician-plaintiff brought a federal copyright infringement suit. 494 F.3d at 383. The defendants moved to dismiss, citing a recording contract with a forum selection clause requiring the musician-plaintiff to bring "any legal proceedings that may arise out of it . . . in England." *Id.* at 382–83. The court held that the forum selection clause did not apply because the musician-plaintiff owned the copyrights to his songs based on "his authorship of the work," not on the recording contract. *Id*. at 390. Similarly, Boyd's ownership of the Deadwood marks is based on his trademark registrations and use, not based on the Agreement because the marks were excluded from the sale.

In *Traton News, LLC v. Traton Corp.*, 528 Fed. App'x. 525 (6th Cir. 2013), the court found that certain Lanham Act claims fell outside the scope of a forum selection clause. *Id.* at 528. Specifically, there, the plaintiff asserted Lanham Act

claims against an entity that owned and operated a website that contained uses of the plaintiff's marks. *Id.* at 527. The plaintiff claimed that its own website, which was visited several times by the defendant, contained a browsewrap agreement, which "include[d] a forum selection clause," and, thus, bound the defendant. *Id.* The court disagreed, holding that the forum selection clause in the browsewrap agreement did not bind the defendant because it was unconnected to the plaintiff's Lanham Act claims. *See id.* at 530. It reasoned the plaintiff's "Lanham Act claims do not depend upon or involve anyone's use of [the website] or its browsewrap agreement." *Id.* Instead, the plaintiff's claims "ar[o]se from its purported ownership of the mark . . . and not from the browsewrap agreement." *Id.* And the allegations supporting the Lanham Act claims in the plaintiff's complaint did "not mention . . . [the] browsewrap agreement." *Id.* Here too, the dispute between the parties has nothing to do with the Agreement. Moreover, unlike the lawsuit filed in the Southern District of Florida, the present complaint does not contain allegations about the Agreement. *See Boyd v. Deadwood Tobacco Co.*, No. 23-22215, 2024 U.S. Dist. LEXIS 37915, at *21 (S.D. Fla. Mar. 5, 2024).

In sum, the claims at issue do not arise out of the Agreement and the forum selection clause is not implicated. No party disputes Boyd's ownership of the excluded Deadwood marks, so there is no need to examine the scope and nature of the sale under the Agreement as the district court concluded. Boyd became the owner in her personal capacity via an independent assignment from DTC which did not have a forum selection clause. For these reasons, I respectfully dissent.

———————————————